[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11737

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 6, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-22957-CV-JEM

JUAN B. FERNANDEZ,

Plaintiff-Appellee,

versus

METRO DADE POLICE DEPARTMENT, et al.,

Defendants,

ROBERT PEREZ,
Sergeant,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 6, 2010)

Before BIRCH, MARCUS and BALDOCK,* Circuit Judges.

_____

* Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting

(continued...)

BALDOCK, Circuit Judge:

Plaintiff Juan B. Fernandez brought this civil rights action pursuant to 42 U.S.C. § 1983 against Defendant Sergeant Robert Perez of the Metro Dade Police Department, among others. Plaintiff alleges Defendant's delay in providing him access to medical care after his February 4, 2006, arrest constituted deliberate indifference to his serious medical needs in violation of his Fourteenth Amendment right to due process. In his motion for summary judgment, Defendant primarily argued he is entitled to qualified immunity because Plaintiff has not shown he suffered an objectively serious medical need. The district court disagreed, concluding Plaintiff had presented evidence "sufficient to create a genuine issue of material fact as to whether Plaintiff was suffering from a serious medical need after his arrest." Fernandez v. Metro Dade Police Dep't, No.06-cv-22957, Order Adopting Magistrate Judge White's Report, *5 (S.D. Fla. Mar. 4, 2009) (D.E. #100). On appeal, Defendant maintains that even considering Plaintiff's facts in the light most favorable to him, he has failed to establish he suffered an objectively serious medical need. After careful review, we conclude the facts, examined in the light most favorable to Plaintiff, do not establish an

---

*(...continued)
by designation.

2

objectively serious medical need. Accordingly, we reverse the district court's denial of qualified immunity.

I.

"Qualified immunity protects public employees performing discretionary functions from the burdens of civil trials and from liability unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Kjellsen v. Mills, 517 F.3d 1232, 1236–37 (11th Cir. 2008) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).[1] Once Defendant asserted the defense of qualified immunity in his motion for summary judgment, Plaintiff took on the burden of satisfying a two-part test: (1) Defendant's conduct violated a federally protected right and (2) that right was clearly established at the time of the conduct. See Duruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003).

We possess jurisdiction to hear Defendant's interlocutory appeal of the district court's denial of qualified immunity at the summary judgment stage under 28 U.S.C. § 1291 and the collateral order doctrine to the extent it presents "a legal question concerning a clearly established federal right that can be decided apart from considering sufficiency of the evidence relative to the correctness of the

---

[1] Neither party disputes Defendant was performing discretionary functions at the time of the alleged constitutional violation.

3

plaintiff's alleged facts." Koch v. Rugg, 221 F.3d 1283, 1294–95 (11th Cir. 2000); see also Bryant v. Jones, 575 F.3d 1281, 1288 n.2 (11th Cir. 2009) (explaining that this Court possesses jurisdiction over an interlocutory appeal of a denial of qualified immunity at the summary judgment stage "under 28 U.S.C § 1291 and the collateral order doctrine"). Within this limited jurisdiction, "[w]e review de novo a district court's denial of summary judgment based on qualified immunity, viewing the evidence in a light most favorable to the opposing party." Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." Scott v. Harris, 550 U.S. 372, 378 (2007). Therefore, we generally consider whether "[t]aken in the light most favorable to the party asserting the injury[,] . . . the facts alleged show the officer's conduct violated a constitutional right" and whether that right was clearly established at the time of the conduct. Id. at 377. But the Supreme Court has cautioned we may only draw inferences in the nonmoving party's favor to the extent they are supportable by the record. Id. at 381 n.8. As we have explained:

> When the nonmovant has testified to events, we do not . . . pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant. Instead, when conflicts arise

between the facts evidenced by the parties, we credit the nonmoving party's <u>version</u>. Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

<u>Evans v. Stephens</u>, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc).

II.

In light of the foregoing discussion, we now set forth the following underlying facts in the light most favorable to Plaintiff. Plaintiff claims during the course of his arrest for burglary at about 3:00 a.m. on February 4, 2006, Metro Dade Police Officers Noel Rodriguez and Radames Perez (who are not parties to this appeal) used excessive force.[2] He asserts the officers handcuffed him and then kicked him multiple times in his face, causing him to bleed from his nose and mouth, stepped on his face as he lay on the ground, stuck one of their thumbs under his chin to the point where he almost fainted, punched him in the head and ribs, and slammed his face into a vehicle's trunk. <u>Fernandez v. Metro Dade Police Dep't</u>, No.06-cv-22957, Pl.'s Decl. in Opp'n to Defs.' Mot. To Dismiss, ¶¶ 15–17 (S.D. Fla. Aug. 14, 2007) (D.E. #22); <u>Fernandez</u>, Order at *3 (D.E. #100). As a result, Plaintiff maintains he suffered injuries to his head, neck, face, and ribs and

---

[2] "Plaintiff was eventually convicted of three counts of burglary of an unoccupied dwelling, one count of resisting an officer without violence, and one count of possession of burglary tools." <u>Fernandez</u>, Order at *1 n.1 (D.E. #100).

5

suffered "a massive bleeding" or "hemorrhage" for more than five minutes while standing by and/or lying on the trunk. Fernandez, Pl.'s Decl. at ¶¶ 16, 17 (D.E. #22); Fernandez v. Metro Dade Police Dep't, No.06-cv-22957, Pl.'s Decl. in Opp'n to Defs.' Mot. for Summ. J., ¶ 9 (S.D. Fla. July 21, 2008) (D.E. #75); Fernandez, Order at *3 (D.E. #100). Plaintiff asserts that one of the arresting officers called Defendant, the officers' supervisor, while they left Plaintiff bleeding near the vehicle. Fernandez, Pl.'s Decl. at ¶ 16 (D.E. #22). Plaintiff admits the record does not indicate how much time passed before Defendant arrived at the scene. Aple. Br. at 3. Regardless, he claims Defendant arrived while he was still near the vehicle's trunk and that Defendant saw him bleeding. Fernandez, Pl.'s Decl. at ¶ 10 (D.E. #75); Fernandez, Order at *4 (D.E. #100). At approximately 5 a.m., Plaintiff maintains the police then took him to the police station, rather than providing medical assistance. Aple. Br. at 4; Fernandez, Pl.'s Decl. at ¶ 10 (D.E. #75). He says he remained at the station in an interrogation room for about nine hours without water or medical treatment while he was in pain, confused, disoriented, and his nose was so full of blood "clogs" that he had to breathe through his mouth. Fernandez, Pl.'s Decl. at ¶ 22 (D.E. #75); Fernandez, Order at *5 (D.E. #100). It is uncontested that although he was arrested at about 3:00 a.m., the police did not take Plaintiff to Jackson Memorial

6

Hospital, Ward D until 11:40 a.m.[3] Fernandez, Pl.'s Decl. at ¶¶ 11, 14 (D.E. #75), Fernandez, Order at *5 (D.E. #100). Plaintiff maintains that Officers Perez and Rodriguez transported him from the police station to Ward D, but that they and Defendant made him wash his face before doing so. Fernandez, Pl.'s Decl. at ¶¶ 23, 26 (D.E. #75); Fernandez, Order at *5 (D.E. #100). Afterwards, Plaintiff states he was transported to and booked at the Dade County Jail where the booking photograph he submitted into evidence was taken.[4] Fernandez, Pl.'s Decl. at ¶ 17,

_____

[3] Officer Perez maintained he terminated his interview of Plaintiff at the police station after about ten minutes and called another officer to have Plaintiff taken to Ward D. Fernandez v. Metro Dade Police Dept't, No. 06-cv-22957, Defs.' Mot. for Summ. J. and Supp. Mem. of Law, Exhibit A, ¶ 7 (S.D. Fla. June 26, 2008) (D.E. #68-2). However, "[t]he [District] Court note[d] that Defendants do not dispute they arrested Plaintiff at 3:00 a.m. and that they did not take him to the hospital until 11:40 a.m." Fernandez, Order at *5 n.5 (D.E. #100) (citing Defs' Objections in Part to the Report of Magistrate Judge at *3, n.2 (D.E. #98)). "As clarified in the Second Declaration of S[gt.] Robert Perez . . ., Plaintiff's interview was brief, but he remained at the police station for a number of hours while his arrest forms and other paperwork were prepared before he was transported to Ward D. As [Sgt.] Perez states in his Second Declaration, it is common practice for police officers to complete all paperwork related to an arrest prior to taking the arrestee to jail, and it is therefore not unusual for an arrestee to wait at the police station for as many as 12 hours even if the officers only spent a few minutes interviewing the arrestee. . . . The same may be true of an arrestee who is taken to Ward D before being taken to jail. As [Sgt.] Perez previously testified, 'It is standard police procedure to take any prisoners with any signs or complaints of injuries, regardless of how minor and regardless of whether they have any visible marks to Ward D prior to admission to the Jail.' Decl. of Sgt. Perez [doc. #68-3] at 13, ¶ 9." Officers Perez and Rodriguez do not provide an explanation for why Plaintiff was taken to Ward D over nine hours after his arrest.

[4] Some dispute exists as to when the police took Plaintiff's jail booking photo. The photo itself is time stamped "Feb 4 2006 12:00AM" but the parties agree the police did not arrest Plaintiff until 3:00 a.m. on February 4, 2006. In his pro se declarations, Plaintiff indicates this sequence of events: (1) arrested around 3 a.m., (2) taken to police station, (3) told to wash his face, (4) taken to the hospital around 11:40 a.m., and (5) taken to the Dade County jail where the photo in question was taken about ten to eleven hours after his arrest. Fernandez, Pl.'s Decl. at

(continued...)

7

18 (D.E. #22). Plaintiff states he "suffered injuries to head, neck, face and ribs at the time of the attack," Fernandez, Pl.'s Decl. at ¶ 28 (D.E. #75), and had difficulty breathing through his nose for three days as a result of his bleeding and pain in his chest. Am. Comp. at ¶ F (D.E. #9).

In support of these claims, Plaintiff submitted his own sworn declarations, his medical records from his examination at Ward D on February 4, and a black and white copy of his jail booking photo. Defendant submitted a color copy of Plaintiff's jail booking photo, his own declarations, and the opinion of Dr. Richard Dellerson, "an expert in emergency medicine, who states that based on his review of the medical records in the record and Plaintiff's booking photo that Plaintiff's statements 'about the extent of his injuries is not compatible with either his booking photo or his medical records.'" Fernandez, Order at *2 (D.E. #100) (quoting Fernandez v. Metro Dade Police Dep't, No.06-cv-22957, Defs.' Mot. for Leave to File Supplemental Decls., ¶ 10 (S.D. Fla. Feb. 23, 2009) (D.E. #99)).

---

[4](...continued)
¶¶ 14, 23, 26, 27, 34 (D.E. #75). In his answer brief, however, Plaintiff's counsel seems to suggest the booking photo was taken prior to Plaintiff's arrival at the hospital. Aple. Br. at 6–7. The district court made no explicit conclusion as to the photo's timing, though it repeatedly referred to it as Plaintiff's "booking photo" which arguably implies it found the photo was taken upon Plaintiff's booking at the Dade County Jail. Regardless, we do not have jurisdiction to resolve this kind of underlying dispute of historical fact and so we credit, without deciding, Plaintiff's pro se declaration that the photo was taken upon his booking at the Dade County Jail.

Adopting the magistrate's report and recommendation, the district court denied the motion for summary judgment as to Plaintiff's claim of deliberate indifference and denied reconsideration. Id. at *5–6; Fernandez v. Metro Dade Police Dept't, No. 06-cv-22957, Order Den. Defs.' Mot. for Recons. in Part of Order Adopting Magistrate Judge White's Report, *2–*3 (S.D. Fla. Mar. 20, 2009) (D.E. #104). Based upon Plaintiff's assertions that (1) Defendant saw him bleeding at the arrest scene, (2) the officers nonetheless took him to the police station for questioning for about nine hours before providing medical treatment after he had suffered a "'huge bleeding'" that resulted in blood clogs which forced him to breath though his mouth while he was in pain and disoriented, and (3) the officers instructed him to wash his face before taking him to Ward D, the district court concluded Plaintiff had presented sufficient evidence "to create a genuine issue of material fact as to whether Plaintiff was suffering from a serious medical need after his arrest." Fernandez, Order at *4–*5 (D.E. #100). The court rejected Defendant's argument that ignoring any factual disputes, Plaintiff could not demonstrate his medical needs were serious. Fernandez, Order at *2–*3 (D.E. #104). The district court also determined that "[n]either Plaintiff's medical records, his booking photo, nor the opinion of Dr. Deller[son] submitted as an

attachment to Defendants' motion to supplement [were] so definitive on the issue of whether Plaintiff was suffering from a serious medical need that [it] could find that no reasonable juror could find for Plaintiff." Fernandez, Order at *5 (D.E. #100).

IV.

Plaintiff sued, asserting Defendant violated his Fourteenth Amendment right to due process by acting with deliberate indifference to his serious medical needs.[5] Therefore, to demonstrate Defendant violated Plaintiff's Fourteenth Amendment due process right, satisfying the first prong of qualified immunity, Plaintiff must show facts that when viewed in the light most favorable to him establish "both an objectively serious medical need and that . . . Defendant acted with deliberate indifference to that need." Burnette v. Taylor, 533 F.3d 1325, 1330 (11th Cir. 2008).[6] Defendant appeals, raising the purely legal issue of whether, taking Plaintiff's version of the events as true, Plaintiff had a serious medical need as

---

[5] "[T]he Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees . . . . However, the standards [for deliberate indifference] under the Fourteenth Amendment are identical to those under the Eighth." Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).

[6] "To establish 'deliberate indifference,' Plaintiff must show that a Defendant had '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" Burnette, 533 F.3d at 1330 (quoting Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005)).

required to establish a constitutional claim for deliberate indifference.

We define a "'serious medical need' as one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." Id. "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009). "In either of these situations, the medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm.'" Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000)). We have explained that a successful constitutional claim for "immediate or emergency medical attention" requires "medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem. In contrast, delay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute" a constitutional violation. Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187–88 (11th Cir. 1994), *abrogated on other grounds by* Hope v. Pelzer, 536 U.S. 730 (2002). An arrestee "who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical

11

treatment to succeed." Id. at 1188; see also Surber v. Dixie County Jail, (No. 06-11898, Nov. 17, 2006, 11th Cir.) (unpublished opinion).

V.

We do not believe Plaintiff has demonstrated an objectively serious medical need. The evidence Plaintiff submitted, taken in the light most favorable to him, reveals that at most he suffered a bloody nose and mouth which lasted over five minutes, facial bruising, pain, disorientation, and blood clogs in his nose. This, however, is as far as Plaintiff's facts take us because we can only draw those inferences that are supportable by the record. Scott, 550 U.S. at 381 n.8 (cautioning that in reviewing motions for summary judgment, courts may only draw inferences in the nonmoving party's favor to the extent they are supportable by the record). Plaintiff does not inform the Court how much longer than five minutes he bled. Notably, he has never alleged that he continued to bleed after being transported to the police station from the arrest scene. The fact that he maintains his nose was full of "blood clogs" while at the police station would, in fact, suggest the bleeding had stopped.

And, Plaintiff's medical records confirm he did not have an objectively serious medical need either at the time of the arrest or by virtue of the delay

12

between arrest and receiving medical attention at Ward D.[7]  According to Plaintiff, he complained to the physician at Ward D "about injuries to the neck, face and scalp . . . ."  Fernandez, Mem. at ¶ 2 (D.E. #83).  Plaintiff contends the hospital doctor diagnosed him with injuries to his face and neck and contusions to the face/scalp/neck areas.  He appears to base that contention on the Ward D's "Emergency Discharge Face Sheet" which is a typed document that bears the notation "THIS FORM SHOULD BE ADDED TO PT.CHART" and is attached to the chart the examining doctor completed himself.  That same "Emergency Discharge Face Sheet" also lists Plaintiff's "complaint" as "facial bruise" and the principal diagnosis as "abrasion."  Regardless, the part of Plaintiff's medical records that we know the treating doctor himself completed indicate Plaintiff's

_____

[7] In determining whether Plaintiff had an objectively serious medical need, we may consider the medical evaluation and treatment he subsequently received.  We recognize that hindsight is, as they say, twenty-twenty.  Nonetheless, the purpose of seeking medical treatment is often to discover what has gone wrong with one's body.  That determination, admittedly after the fact, can shed light on how wrong something went and when it went wrong.  Therefore, judges having to make legal determinations as to whether someone manifested an *objectively* serious medical need at certain point in time may properly consider a physician's subsequent evaluation and treatment.  See e.g., Goebert, 510 F.3d at 1320, 1326 (explaining that the plaintiff was diagnosed with a massive amniotic fluid loss which resulted in a stillbirth and that "[m]edical evidence in the record establishe[d] that prolonged amniotic leakage constitutes a serious medical problem that can lead to infection and the death of a fetus.  The evidence in the record [was] sufficient to satisfy the objective component of the deliberate indifference test"); Farrow, 320 F.3d at 1244 (considering the plaintiff's medical records in determining whether he had a serious medical need); Aldridge v. Montgomery, 753 F.2d 970, 973 (11th Cir. 1985) (discussing evidence of the plaintiff's subsequent medical treatment as part of the serious medical need analysis).

13

"chief complaint" was injury to his face that occurred as a result of a "direct blow" "just prior to arrival." Notably, nowhere on the chart did the doctor indicate Plaintiff was presently bleeding, complained of recent bleeding, or complained of difficulty breathing. Upon examination, the doctor described his clinical impression of Plaintiff's condition as "bruises to face." The doctor noted Plaintiff's neck, chest, abdomen, and extremities were not tender and he had a painless full range of motion. According to the records, Plaintiff evidently exhibited no signs of disorientation, confusion, or weakness. The records also reflect the doctor indicated a normal external ear, nose, and throat exam with no injury to the lips, gums, or pharynx. Plaintiff apparently did not have any open wounds, did not require stitches, and needed no other medical procedures. Plaintiff's booking photograph confirms he did not receive any stitches or bandages to his face or otherwise have any open facial wounds. The treating doctor prescribed two tablets of Tylenol. According to Plaintiff the doctor did so at Plaintiff's request: "Plaintiff asked the doctor at Jackson Memorial Hospital for any medication for headaches because he was in extreme pain. The doctor gave [him] two (2) Tylenol pills because Plaintiff was still suffering from headaches resulting from the attack by Defendants." Id. at ¶ 7. The doctor placed no limits on Plaintiff's exercise or activity and discharged him to "home or self-care."

14

Besides the Tylenol provided at Plaintiff's request, Plaintiff's medical records reveal his injuries did not *require* medical treatment.

Plaintiff makes much of the fact that, according to him, Defendant and Officers Perez and Rodriguez instructed him to wash his face before taking him to Ward D. Such a fact may bear on Defendant's alleged deliberate indifference, particularly if that were the only "medical attention" Defendant had afforded Plaintiff. But that is a separate inquiry. Because we do not think it possible to wash away an objectively serious medical need and we credit Plaintiff's assertions, without any further proof, that he bled at the scene of the arrest, we find this specific allegation inconsequential at this stage in our analysis.

Two cases in particular illustrate that the facts, even taken in the light most favorable to Plaintiff, do not amount to an objectively serious medical need in our circuit. First, in Aldridge v. Montgomery, 753 F.2d 970 (11th Cir. 1985), the plaintiff maintained during his arrest he suffered a one and a half inch cut over his right eye. After arrest, the plaintiff was placed in a holding cell at county jail for over two hours during which time "[t]he cut continued to bleed, forming a pool of blood on the floor approximately the size of two hands." Aldridge, 753 F.2d at 971. The plaintiff was then taken to the hospital where he received six stitches and prescribed icepacks and aspirin, neither of which he was ultimately provided.

Id. We concluded that these facts precluded a directed verdict in favor of the defendants on the plaintiff's claim of deliberate indifference to serious medical needs. In contrast, Plaintiff only maintains he bled for over five minutes, but does not assert he bled much longer than that or that he bled while detained at the police station. Plaintiff's medical records and booking photo reveal he had no open wounds at all, much less ones requiring stitches.

In Martin v. Gentile, 849 F.2d 863 (4th Cir. 1988), a case we cited with approval in Hill, the Fourth Circuit affirmed the district court's conclusion that the plaintiff had not demonstrated a serious medical need. The plaintiff in Martin arrived at the police station after his arrest with:

> [A] cut over one eye, a quarter-inch piece of glass embedded in his palm, and bruises on his shoulders and elbows. But he presented no medical evidence that these injuries were serious enough to require medical attention any earlier than he received it. The cut over his eye was small and had stopped bleeding by the time he was taken before the magistrate [four hours after arrest], largely as a result of the officers' efforts at first aid. The sliver of glass in his palm was no doubt uncomfortable, but it was not a serious injury. There is no suggestion that the delay in taking him to the hospital exacerbated his injuries in any way; indeed, the doctor who examined him in the emergency room testified that [the plaintiff]'s injuries were minor and did not require either stitches or painkiller.

Martin, 849 F.2d at 871.

Similarly, in this case, Plaintiff has never claimed he bled much longer than

16

five minutes or at any location other than the scene of the arrest. The medical evidence reflects his bleeding had stopped at least by the time he arrived at Ward D. In fact, Plaintiff's injuries were so minor that a doctor thought no medical attention or treatment other than two Tylenol was appropriate. Plaintiff has not provided any medical evidence that his injuries were serious enough to require medical attention any earlier than he received it. And, though his alleged injuries likely caused pain and discomfort, Plaintiff has not provided any medical evidence to suggest that the delay exacerbated Plaintiff's injuries to the point of an objectively serious medical need or even ran the risk of doing so. The medical evidence in the record confirms that Plaintiff's asserted symptoms at the arrest scene and police station, while they no doubt caused him pain, did not indicate a "life-threatening condition[] or situation[] where it [was] apparent delay would detrimentally exacerbate the medical problem" to a lay person, Hill, 40 F.3d at 1187, or "one that, if left unattended, pos[es] a substantial risk of serious harm." Farrow, 320 F.3d at 1243 (quoting Taylor, 221 F.3d at 1258).

In so holding, we do not mean to imply we disagree with the district court that a reasonable jury could find that the events of February 4, 2006 occurred just as Plaintiff says they did. We have no jurisdiction to pronounce such a disagreement. But we do have jurisdiction to conclude those facts Plaintiff has

17

presented and the district court identified do not establish as a matter of law that he suffered an objectively serious medical need and, therefore, do not amount to a constitutional violation. For this reason, we REVERSE the district court's rejection of Defendant's assertion of qualified immunity.